IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JANICE K. THARP,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      Case No.
                                          )      05-3116-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner            )
of Social Security,                       )
                                          )
            Defendant.                    )

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND GRANTING PLAINTIFF'S MOTION FOR REMAND

        Plaintiff Janice Tharp seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for a period of disability and

disability insurance benefits under Titles II and XVI of the Social Security Act ("the

Act").  Plaintiff argues that the ALJ erred in (1) finding plaintiff's foot pain,

hypertension, osteoporosis, plantar fasciitis, allergic rhinitis, and depression non-

severe; (2) failing to give controlling weight to the opinions of treating physicians

Dr. Sparks and Dr. Paff, and by giving too much weight to the opinion of Dr. Ash;

(3) failing to request a consultative exam and medical source statement regarding

plaintiff's depression and possible borderline intellectual functioning; (4) failing to

compare plaintiff's residual functional capacity with the requirements of plaintiff's

past relevant work; and (5) failing to conduct a proper credibility analysis.  I find

that the substantial evidence in the record supports the ALJ's findings on all of the

challenged issues except plaintiff's ability to do her past relevant work.  Therefore, plaintiff's motion for summary judgment will be denied, the decision of the Commissioner will be reversed, and this case will be remanded for a comparison of plaintiff's residual functional capacity with the requirements of her past relevant work and, if necessary, for an alternate finding at step five of the sequential analysis

## I.    BACKGROUND

On December 11, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since April 23, 1995.  Plaintiff's disability stems from back and knee problems and depression.  Plaintiff's application was denied on March 12, 2003.  On June 8, 2004, a hearing was held before Administrative Law Judge Linda Carter.  On November 22, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On February 1, 2005, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported

Case 6:05-cv-03116-REL   Document 14   Filed 03/20/06   Page 2 of 56

by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

4

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert

Michael Lala, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1977

through 2004:

| 1977 | $ 2,208.72 |
| 1978 | $ 4,322.05 |
| 1979 | $    123.19 |

5

| | |
|---|---|
| 1980 | $ 4,451.55 |
| 1981 | $ 5,742.61 |
| 1982 | $ 6,923.76 |
| 1983 | $ 6,953.83 |
| 1984 | $ 7,593.85 |
| 1985 | $ 8,509.85 |
| 1986 | $ 3,727.93 |
| 1987 | $ 5,681.48 |
| 1988 | $ 5,394.09 |
| 1989 | $ 8,374.62 |
| 1990 | $ 8,756.98 |
| 1991 | $ 8,125.58 |
| 1992 | $ 5,199.16 |
| 1993 | $ 1,893.90 |
| 1994 | $ 9,024.24 |
| 1995 | $ 2,696.96 |
| 1996 | None |
| 1997 | None |
| 1998 | None |
| 1999 | None |

| | |
|---|---|
| 2000 | None |
| 2001 | None |
| 2002 | None |
| 2003 | None |
| 2004 | None |

(Tr. at 56-60, 64).

**Disability Report Adult**

On October 22, 2001, plaintiff completed a Disability Report describing her duties as a sewing machine operator from 1988 through 1992 (Tr. at 67). Plaintiff worked four days per week, ten hours per day (Tr. at 67). She sat all ten hours per day (Tr. at 67). At the end of the form, plaintiff wrote that she is needed at home to take care of her husband, that both of his legs are gone, he has had a stroke, and he cannot take care of himself (Tr. at 73).

**Disability Report Adult**

On December 25, 2002, plaintiff completed another Disability Report wherein she stated that while working as a sewing machine operator, she sat constantly and did no standing (Tr. at 95). Her medications at that time were to treat high blood pressure, arthritis, high cholesterol, acid reflux disease, and hormone replacement therapy (Tr. at 99).

**Work History Report**

In a Work History Report dated November 15, 2001, plaintiff described her sewing machine operator job as requiring no standing, climbing, kneeling, crouching, or crawling (Tr. at 81). The job required constant sitting (Tr. at 81, 82).

In a second Work History Report dated January 24, 2003, plaintiff again described her job as a sewing machine operator as requiring constant sitting and no standing or walking (Tr. at 124-125).

**Claimant Questionnaire**

In a Claimant Questionnaire dated November 15, 2001, plaintiff reported that she takes only Vioxx, 25 mg., and that she has no side effects from her medication (Tr. at 88). She reported that she tries to do all the household chores herself (Tr. at 90). She reads the newspaper, but her reading and spelling are not very good (Tr. at 90). Plaintiff drives to the grocery store, she drives her husband to his doctor appointments, and she drives to visit her children (Tr. at 90). The most she drives is ten to 15 miles at a time (Tr. at 90). She reported having no difficulties leaving the house or being away from home (Tr. at 90).

Plaintiff reported that she takes care of her husband by feeding him, making sure he takes his medication, and staying home with him because he had a stroke (Tr. at 91). She also takes care of her two pet birds (Tr. at 91).

In another Claimant Questionnaire dated January 24, 2003, plaintiff reported that she does her household chores herself (Tr. at 132). At this time she reported that she did not have a valid driver's license; however, she said she drives to the doctor, to the therapist, and to the store (Tr. at 132).

## Claimant Questionnaire Supplement

In a supplemental Claimant Questionnaire dated November 15, 2001, plaintiff reported that she can sit for 30 minutes to an hour at a time, she can stand for one to two hours, she can walk for five to ten minutes, and she can use her hands as long as she needs to (Tr. at 87). Plaintiff reported that she cannot lift, bend, kneel, squat, or reach overhead (Tr. at 87). She can carry things if they are not very heavy, and she does not climb stairs very often (Tr. at 87).

## Disability Report Field Office

On January 2, 2003, Mayela Hilton interviewed plaintiff over the telephone (Tr. at 111-115). Ms. Hilton observed that plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, or answering (Tr. at 114).

## B.  SUMMARY OF MEDICAL RECORDS

Plaintiff's alleged onset date is April 23, 1995; however, the first medical visit in this record is dated June 19, 1998. On that day, plaintiff saw James Shaeffer, M.D., an orthopedic surgeon, who diagnosed "almost end-stage

9

arthritis" in both knees, worse in one knee than the other (Tr. at 166). In completing the paperwork for her visit, plaintiff did not check the box marked "depression" (Tr. at 167-168).

On September 23, 1999, plaintiff was seen at the Kitchen Clinic for medication refills, and she reported that Prilosec was "really helping [her] stomach" (Tr. at 185). She said she was feeling well.

On December 9, 1999, plaintiff was seen at the Kitchen Clinic for a refill on her medication (Tr. at 184). "No health complaints". Plaintiff had been out of her medication for one month.

On August 15, 2000, plaintiff was seen at the Kitchen Clinic for upper back pain (Tr. at 181). The doctor assessed muscular back pain and recommended Ibuprofen.

On November 14, 2000, plaintiff was seen at the Kitchen Clinic for a refill on her medicine, and to have her left knee checked (Tr. at 178). Plaintiff reported having headaches with the Monopril and she also had cold symptoms. On exam, her blood pressure was listed as OK. The doctor refilled plaintiff's Premarin, Prilosec, and Monopril, and recommended she make an appointment with Dr. Shaeffer for her knee.

On November 15, 2000, plaintiff saw Dr. Shaeffer and reported that one month ago she was on the floor and felt her knee pop (Tr. at 164-165). Plaintiff

10

had had x-rays taken at City Medical Clinic but had no treatment.

In an undated medical record from the Kitchen Clinic which appears between November 14, 2000, and May 24, 2001, plaintiff complained of vomiting after every meal for the past two to three months (Tr. at 176). She reported no weight loss. The doctor recommended she check her blood pressure every day for five days, walk one to two miles every day, and continue her Monopril (for blood pressure) and Premarin (conjugated estrogen used to treat symptoms of menopause).

On December 7, 2000, plaintiff saw Dr. Shaeffer at St. John's Regional Health Center due to knee pain (Tr. at 155-156). Dr. Shaeffer noted that plaintiff's hypertension was well controlled on Monopril; her abdomen, back, and extremities were within normal limits except her left knee where she had patellofemoral crepitation[1] and tenderness around the anterior aspect of the knee. Plaintiff underwent an arthroscopy[2] and lateral patellar retinacular release and

---

[1]Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions.

[2]Arthroscopy is a surgical procedure used to visualize, diagnose, and treat problems inside a joint. In an arthroscopic examination, an orthopaedic surgeon makes a small incision in the patient's skin and then inserts pencil-sized instruments that contain a small lens and lighting system to magnify and illuminate the structures inside the joint. Light is transmitted through fiber optics to the end of the arthroscope that is inserted into the joint. By attaching the arthroscope to a miniature television camera, the surgeon is able to see the interior of the joint through this very small incision rather than a large incision needed for surgery. The television camera attached to the arthroscope displays the image of the joint

11

debridement of the patella[3] the following day (Tr. at 157).

Plaintiff returned to see Dr. Shaeffer on December 20, 2000 (Tr. at 163). She was able to straight leg raise, could flex to 90 degrees. Plaintiff was still using crutches, and Dr. Shaeffer told her to wean to one crutch and then off of them completely over the next week or two and return in one month.

On January 17, 2001, plaintiff returned to see Dr. Shaeffer (Tr. at 161, 251). Dr. Shaeffer recommended that plaintiff "just use ibuprofen or naproxen" for any stiffness in her knee and come back in three months.

On May 23, 2001, plaintiff was seen at the Kitchen Clinic (Tr. at 172). Plaintiff complained of sinus pain and drainage. "Also complains of nervousness and has quite a lot of stress/family related". Most of the record is illegible.

On May 24, 2001, plaintiff was seen at the Kitchen Clinic for a refill on her medications (Tr. at 175). Most of the record is illegible. The diagnoses include hypertension - controlled; acid reflux disease; and chronic [illegible], allergy induced.

---

on a television screen, allowing the surgeon to look throughout the knee--at cartilage and ligaments, and under the kneecap. The surgeon can determine the amount or type of injury, and then repair or correct the problem, if it is necessary.

[3]The patella is the knee cap. The back of the patella is coated with smooth cartilage that helps it glide as the knee bends. The patella can be fractured or get a disease, such as arthritis, that can cause the patella cartilage to soften or deform. Patellar debridement is a procedure in which the patellar cartilage surface is shaved and smoothed.

12

On June 14, 2001, plaintiff was seen at the Kitchen Clinic for a refill on her medication (Tr. at 174). She also complained of pain in her left foot. The doctor prescribed Vioxx for plaintiff's foot pain.

On June 26, 2001, plaintiff was seen at the Kitchen Clinic for a sore throat and a bad cold (Tr. at 173). The doctor diagnosed mild nasal congestion. Plaintiff had a throat culture for strep, was told to use lozenges, saline and nasal spray, drink fluids, and return as needed.

On September 13, 2001, plaintiff was seen at the Kitchen Clinic (Tr. at 171). Plaintiff continued to have sinusitis and pain in her right heel. The doctor diagnosed bursitis in her heel, muscle spasm in her back, arthritis in her back, hypertension, and anxiety. The remainder of the record is illegible.

On October 31, 2001, plaintiff filed an application for supplemental security income (Tr. at 312-315). She listed her onset date as January 1995 with her disability stemming from her knees, back, and heel. She noted that her husband became disabled in May 1995 due to leg amputation and stroke. Her husband receives $546 per month in Social Security benefits.

On October 31, 2001, plaintiff was seen by David G. Paff, M.D., a specialist in occupational medicine, at the request of the Division of Family Services (Tr. at 187-188). Portions of Dr. Paff's report are as follows:

13

**HISTORY**: . . . She states that she really quit her last job partly due to the pain and partly due to the fact that her husband had a CVA[4] and she had to take care of him. Since then he has had amputation of both legs and more CVAs and she has to take care of him. . . . She has pain all of the time in the low back area and sometimes into the buttocks and bilateral lower extremity to the knee. She can decrease the pain by moving around. . . . She states when she first gets up in the morning she coughs and vomits. After each meal she vomits undigested food after a few minutes. She feels like it gets "hung up" in her esophagus. She has not lost weight but, in fact, has gained weight. . . .

**SOCIAL HISTORY:** Patient has been married for 34 years and has five children, ages 27 to 38. She has finished high school, reads and writes, but has difficulty spelling.

**PHYSICAL EXAMINATION:** Examination reveals a pleasant, cooperative lady in no distress. She does sit on the backless table for 40 minutes or so without difficulty. . . .

**FINDINGS:** Patient has a little difficulty getting off the table and when she first starts walking she has a severe limp, which goes away pretty much after she has walked a few steps. She has full range of motion in her lumbar spine, shoulders and neck. She is only able to squat 50% of normal, though has full range of motion in her knees passively. She has tenderness over the plantar arch of the right foot. She is overweight. . . .

**LAB DATA:** Patient did have a number of laboratory tests, including a TSH[5], which was normal. She had a blood count that was normal. Differential was normal. Urinalysis was normal. Blood sugar was 99, which is normal. Kidney and liver function tests were normal. Cholesterol was mildly elevated at 250 and triglycerides mildly elevated at 319.

**SUMMARY:** This lady has multiple problems. The most significant is that she probably has a stricture of her esophagus and needs to have an evaluation and treatment for that. She needs to have treatment for her plantar fasciitis. She also has low back pain and mild knee pain secondary

---

[4]Cerebrovascular Accident, or stroke.

[5]Thyroid stimulating hormone.

14

to degenerative arthritis. It is unlikely that she will return to work and at this point is probably disabled. She also needs to be treated for osteoporosis, which I imagine is present.

(Tr. at 187-188).

On November 30, 2001, plaintiff was seen at the Doctor's Hospital of Springfield (Tr. at 243-244). The notes state that plaintiff saw Dr. Paff for disability earlier this month and was experiencing symptoms of menopause. It was recommended that plaintiff increase her Premarin, Pepcid, Monopril and Celebrex as directed, and increase her water consumption. The assessment was hypertension, menopausal syndrome, gastroesophageal reflux disease ("GERD"), chronic generalized pain, and allergic rhinitis, all stable. It was noted that plaintiff had normal judgment and insight, and her mood and affect were appropriate.

On December 20, 2001, plaintiff was seen at the Doctor's Hospital of Springfield for cold systems (Tr. at 241-242). She noted that the Celebrex was helping her generalized pain. The assessment was hypertension, menopausal symptoms, gastroesophageal reflux disease, allergic rhinitis, and generalized pain. Plaintiff was told to stop Pepcid and increase her Zantac for her GERD. It was noted that plaintiff had normal judgement and insight, and her mood and affect were appropriate.

On January 2, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for nasal congestion and cough (Tr. at 239-240). She noted that the

15

Celebrex was working well.  The assessment was hypertension, sinusitis, allergic rhinitis, and generalized pain.  Plaintiff was given antibiotics and told to return in two weeks.  It was noted that plaintiff had normal judgment and insight, and her mood and affect were appropriate.

On January 16, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for a follow up (Tr. at 237-238).  Plaintiff stated she continued to have sinus drainage, and she was having some back and knee pain with the weather changes.  The doctor recommended dietary changes to decrease symptoms of acid reflux.  The assessment was hypertension, gastroesophageal reflux disease, and allergic rhinitis [sinus infection], all unchanged and stable.  Plaintiff was noted to have normal judgment and insight, and her mood and affect were appropriate.

On January 18, 2002, plaintiff saw Mark Coburn, M.D., for x-rays of her knees and lumbar spine (Tr. at 193).  Dr. Coburn found "very mild degenerative changes at L4-5 and both knees."

On February 18, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for a follow up and for right heel pain (Tr. at 234-236).  Plaintiff's foot was x-rayed by Nathan Kester, M.D., who found nonspecific marked arthritis changes in the right first metatarsal  joint, probably osteoarthritis; and posterior and inferior calcaneal spurs.  The doctor assessed hypertension, gastroesophageal reflux disease, allergic rhinitis, and heel pain, all unchanged and stable, and

16

recommended plaintiff return in one month.

On March 4, 2002, plaintiff's application for disability benefits was denied (Tr. at 318).

On April 5, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for a follow up (Tr. at 232-233). She reported that her gastrointestinal symptoms were "much better" on Prevacid. Plaintiff's cholesterol was high, and the doctor recommended diet and exercise and provided her with handouts. Plaintiff was diagnosed with gastroesophageal reflux disease, hypertension, and hyperlipidemia (high cholesterol and triglycerides), all unchanged and stable. She was noted to have normal judgment and insight, and her mood and affect were appropriate.

On April 9, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for a routine exam (Tr. at 229-230). The form stated that Dr. Paff's report (dated October 31, 2001) noted osteoporosis, and that plaintiff had no history of bone density tests. The doctor scheduled a bone density test and recommended proper diet and daily weight bearing exercise. Plaintiff was noted to have normal judgment and insight, and her mood and affect were appropriate.

On April 30, 2002, Nathan Kester, M.D., performed a bone density test due to Dr. Paff's earlier diagnosis of osteoporosis (Tr. at 227). Plaintiff's bone density was normal.

On June 4, 2002, plaintiff was seen at the Doctor's Hospital of Springfield complaining of right shoulder pain (Tr. at 221-222). The doctor assessed right shoulder pain, hypertension, hyperlipidemia and another illegible condition, all unchanged and all stable. Plaintiff was noted to have normal judgment and insight, and her mood and affect were appropriate.

On July 8, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for a follow up (Tr. at 217-218). She stated that she was doing pretty good but her hands and feet felt swollen. The doctor found only trace edema. The assessment was hypertension, edema, hyperlipidemia, anemia, and dysuria [difficulty or pain with urination], unchanged and stable. Plaintiff had normal judgment and insight, and her mood and affect were appropriate.

On August 20, 2002, plaintiff was seen at the Doctor's Hospital of Springfield for increased back pain (Tr. at 214-215). The assessment was hypertension, anemia, hyperlipidemia, and back pain, all unchanged and all stable. It was also noted that plaintiff had normal judgment and insight, and her mood and affect were appropriate.

On September 10, 2002, A. J. Cohn, D.O., performed a colonoscopy and biopsy due to plaintiff's anemia (Tr. at 212). Plaintiff had one polyp, otherwise her colonoscopy was normal.

18

On September 24, 2002, plaintiff was seen at the Doctor's Hospital of Springfield where she reported that her back pain was better (Tr. at 207-208). The assessment was hypertension, hyperlipidemia, anemia, back pain, and allergic rhinitis, all unchanged. It was noted that plaintiff had normal judgment and insight, and her recent/remote memory were intact.

On December 11, 2002, plaintiff applied for disability benefits (Tr. at 322-333).

On December 18, 2002, plaintiff had an MRI of her lumbar spine, performed by Nathan Kester, M.D., a radiologist (Tr. at 204). Dr. Kester assessed small right posterior paracentral disc herniation at L4-L5, diffuse lumbar degenerative disc disease most evident at L4-5 and L5-S1, and mild facet joint arthrosis at L3-4, L4-5, and L5-S1. Plaintiff began physical therapy for her lower back (Tr. at 202, 204).

On January 7 , 2003, plaintiff saw Dr. Shaeffer for knee pain (Tr. at 251). Dr. Shaeffer noted that plaintiff had good range of motion in each knee, there was no swelling or heat. Her x-rays were within normal limits and showed only a little thinning of the cartilage between the lateral facet of the knee cap and the femur of the right knee. "I gave her a trial of Mobic[6] 15 mg q [every] day. She has been taking Celebrex but it does not seem to be helping."

_____

[6]A non-steroidal anti-inflammatory.

19

On February 11, 2003, plaintiff saw Dr. Shaeffer for a physical exam (Tr. at 250). He diagnosed knee pain and osteoarthritis of the knee and recommended that plaintiff continue taking the Mobic.

On March 7, 2003, plaintiff saw Charles Ash, M.D., at the request of Disability Determinations (Tr. at 252-254). Portions of the report read as follows:

**GENERAL:** This is an obese woman who stands erect and moves about satisfactorily without limp or list. She walks on toes and heels hesitantly but satisfactorily. Leg lengths are equal. She squats 25 percent normally. She has moderate difficulty arising from the exam table. She has no difficulty arising from the chair, dressing or undressing. . . .

**CERVICAL SPINE:** There is normal motion. There is no tenderness. There is no muscle spasm or deformity. [All range of motion measurements were normal].

**THORACIC SPINE:** There is tenderness throughout the lumbar spine and sacrum. There is normal motion. There is no spasm or deformity. [Range of motion for flexion, extension, right lateral bending, left lateral bending, right rotation, and left rotation were all normal].

**UPPER EXTREMITIES:** There is normal range of motion. There is no effusion or instability. There is no weakness, deformity or atrophy. Grip and pinch are strong in both hands. Pulses are satisfactory. Reflexes are equal and active. There is no sensory deficit. [Range of motion for forward elevation of shoulders, backward elevation, abduction, adduction, internal rotation, and external rotation were all normal. Range of motion for elbow extension, flexion, supination, and pronation were all normal. Range of motion for dorsiflexion of wrists, palmar flexion, radial deviation, and ulnar deviation were all normal. All finger range of motion measurements were normal].

**LOWER EXTREMITIES:** Straight leg raising is 90 [normal]. Pulses are satisfactory. There is tenderness about both knees anteriorly. Reflexes are equal and active at the knees and ankles. There is normal motion of the hips, knees and ankles. There is no weakness, deformity or atrophy. There

20

is no sensory deficit.  [Range of motion for hip flexion, abduction, adduction, external rotation, and internal rotation were normal.  Range of motion for knee extension and flexion were normal.  Range of motion for ankle dorsiflexion, inversion, plantar, and eversion were normal].

**DIAGNOSIS:**  Probable degenerative arthritis lumbar spine and both knees.

**COMMENT:**  She can stand and walk six hours in a workday.  She can lift 20 pounds occasionally and 10 pounds frequently.

Dr. Ash noted that plaintiff's gait was normal without any assistive device. (Tr. at 252-254).

On March 11, 2003, Kenneth Burstin, Ph.D., a clinical psychologist, completed a Psychiatric Review Technique (Tr. at 255-256).  He found no medically determinable impairment.  In support of his finding, Dr. Burstin wrote, "This 55 year old claimant alleges depression.  She has seen a medical professional regularly since 10-01 and does not mention any difficulty with depression. She does have some ongoing pain and has been through PT [physical therapy] again without mention of depression.  There is not a diagnosis, no hospitalization, no medications.  She simply feels that she is depressed.  Her ADL's [activities of daily living] are limited due to her physical problems.

On March 12, 2003, plaintiff's application for disability benefits was denied (Tr. at 335).

On April 4, 2003, plaintiff went to see Jay Sparks, M.D., to establish care (Tr. at 299-302).  Plaintiff reported she had had hypertension for several years but

21

it was under control with medication, and Dr. Sparks noted that her recent labs were normal. She said she had hyperlipidemia which is also under control with medication. She did not have a structured exercise program. Plaintiff was having some symptoms of acid reflux, and told Dr. Sparks she was trying to avoid large meals. Plaintiff reported having lumbar back pain, "somewhat better with pressure as well as sitting". Plaintiff stated that she was given Lexapro for fatigue/insomnia which she tolerated well with no adverse effects and she requested a refill. On exam, Dr. Sparks noted vague tenderness to palpation in her lower lumbar area. Plaintiff's mood, affect, and judgement were appropriate. He assessed osteoarthritis, reflux, hyperlipidemia, hypertension, fatigue, malaise, and insomnia. He refilled her current medications and added Zantac for reflux. "[H]ad a lengthy discussion about diet and exercise, both for cardiovascular fitness, weight loss, as well as stress reduction."

On May 5, 2003, plaintiff returned to Dr. Sparks for a follow up and complaining of sinus problems (Tr. at 296-297). Plaintiff stated that her reflux was fine as long as she eats small amounts. Plaintiff's hypertension was stable on her medication with no adverse side effects. Plaintiff was tolerating her hyperlipidemia medications with no adverse effects. Plaintiff stated that her back pain had been relatively stable since her last visit in early April. Dr. Sparks examined plaintiff's back and found no significant change from the previous exam

22

on April 4, 2003. Plaintiff's mood, affect, and judgment were all appropriate. Dr. Sparks scheduled plaintiff for an upper GI.

On May 15, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 292-293). Plaintiff complained of back pain, but Dr. Sparks had not yet received plaintiff's previous MRI for review. Plaintiff reported difficulty with sleeping, but said that was unrelated to her back problem. Plaintiff had some symptoms of reflux. Plaintiff was tolerating her hypertension medication well with no adverse side effects. Plaintiff was tolerating her Lopid well, prescribed for high cholesterol. Dr. Sparks noted that plaintiff had no structured dietary or exercise program. On exam Dr. Sparks found vague tenderness to palpation in the lumber/sacral area. He assessed hypertension, chronic back pain, hyperlipidemia, reflux, and fatigue. He ordered blood work and increased her Lexapro.

On May 27, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 289-290). Plaintiff continued to have back pain which was made worse with prolonged sitting, walking, and lying. Plaintiff continued to have problems with insomnia. Her mood, affect, and judgment were appropriate. Dr. Sparks noted vague tenderness to palpation throughout the lumbar area. He assessed lumbar back pain, reflux, hypertension, and insomnia. He continued her on her current medications and mentioned a referral to a pain clinic.

23

On June 27, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 286-287). Plaintiff stated that her reflux was "considerably better" and her symptoms had alleviated. Plaintiff stated that her back pain was unchanged, that she was tolerating Neurontin well with no adverse effects. Plaintiff stated that she had "completed her forms" but had not heard anything. Plaintiff's mood, affect, and judgment were appropriate. Dr. Sparks assessed hypertension, reflux "markedly improved", and chronic lumbar pain. Dr. Sparks increased plaintiff's Neurontin, said he was check into plaintiff going to the pain clinic, and encouraged plaintiff to continue her exercise and dietary programs for weight loss.

On August 26, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 283-284). "With regards to her reflux, feels she has been relatively stable as long as she takes her Nexium 40 mg. one daily and watches reflux precautions. She feels she is trying hard to diet and exercise in attempt to lose weight, as well as improve her overall status. With regards to her weight, she feels she has had some increasing difficulty in losing weight. Feels, in fact, has actually gone up since the last time we had seen her, despite walking two miles three times a week and riding her stationery [sic] bike 30 minutes before she goes to bed." Plaintiff's mood, affect, and judgement were all appropriate. Dr. Sparks assessed dysmetabolic syndrome[7], hyperlipidemia, hypertension, and reflux. "We had a

---

[7]Dysmetabolic syndrome is a set of risk factors that includes abdominal obesity, a decreased ability to process glucose (insulin resistance), dyslipidemia (unhealthy

lengthy discussion about diet and exercise, both for cardiovascular fitness, weight

loss, as well as stress reduction." Dr. Sparks noted that plaintiff had an

appointment scheduled with the chronic pain clinic in September.

On September 2, 2003, plaintiff saw Benjamin Lampert, M.D., for low

back pain after having been referred by Dr. Sparks (Tr. at 280-282). Portions of

his report are as follows:

> **PAST MEDICAL HISTORY:** Other health problems include arthritis, acid
> reflux, hypertension, depression.
>
> * * * * *
>
> **PSYCHOLOGICAL:** She endorsed depression, anxiety, stress, and panic
> attacks.
>
> **PHYSICAL EXAMINATION:**
> **GENERAL:** She is a pleasant lady in no apparent distress.
>
> **MUSCULOSKELETAL:**
> 1. Gait: She walks with a slight forward list.
> 2. Spinal examination: Examination of the thoracic and lumbar spine
>    reveals no external deformities. There is some tenderness in the
>    midline at about the L4 spinous process. She also has some mild
>    tenderness in the thoracic region at about T3 in the midline and
>    paraspinous area but not as severe as the back tenderness. She has
>    some mild tenderness in the sacral sciatic notch, but overall, her
>    midline pain to palpation is most severe at L4-5. Straight leg lifting
>    is negative bilaterally.
> 3. Extremities: She has good range of motion in the hips, knees, and
>    ankles. There are no signs of any acute joint disease in the upper or
>    lower extremities. She has a negative Patrick's maneuver. There is
>    crepitance to palpation in the knees bilaterally on flexion and
>    extension.

--------------------

lipid levels), and hypertension.

25

**NEUROLOGICAL:** Mood and affect are appropriate. . . .

**REVIEW OF MEDICAL DATA:** Her lumbar spine films are available for my review. They reveal a narrowed L4-5 disc space with some mild osteophyte formation present. Her knee x-ray reveals mild degenerative changes. Her MRI reports from December 19th reveal diffuse lumbar degenerative disease at L4-5 and L5-S1 with mild facet arthrosis and a small L4-5 right paracentral disc protrusion. . . .

**IMPRESSION:** My impression is that she has lower back pain, probably secondary to degenerative disc disease at L4-5.

**PLAN:** Unfortunately, there aside from referring her to a spine surgeon for a fusion operation there is not much interventionally that can be done that would be very helpful for her pain, even the fusion operation would not be highly likely to give her long-term success rate because of the multilevel disc degeneration that is present.

She also has some mild lumbar spondylosis, but with her predominant midline pain, I do not think that pursuing facet nerve blocks would be very helpful. Likewise, if she has more midline pain than unilateral pain, sacroiliac joint injections are not going to be beneficial.

I have given her a trial of Ultram 50 mg to take one four times a day. Other mild analgesics may be beneficial. It does not appear as though the Neurontin has been very helpful, and I have advised her that she might consider discontinuing this after speaking with Dr. Sparks.

I have given her a prescription for physical therapy to do 10 visits of dynamic lumbar stabilization. Perhaps learning back exercises, loosing [sic] weight, improving her cardiovascular fitness will help her to live with her back pain.

(Tr. at 280-282).

On October 7, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 277-278). Plaintiff's mood, affect, and judgement were all appropriate. "With regards

26

to her dysmetabolic syndrome, has started her on Actos[8]. . . . Feels she tolerates this well with no adverse effects, but feels that she had minimal weight loss regarding this regimen.  She otherwise had been through the chronic pain program and continues to with physical therapy as well as pool therapy, massage, which she feels helps and aids her walking program."  He continued plaintiff on her current medications.  "We also had a lengthy discussion about diet and exercise, both for cardiovascular fitness, weight loss, stress reduction."

On October 24, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 274-275).  Plaintiff stated that her hypertension and reflux were stable and she was having no adverse effects from her medication.  She had planned to go to physical therapy on recommendation of the pain clinic for her back but had not been able to go due to her husband having surgery.  She complained of some discomfort in her biceps.  Plaintiff's mood, affect, and judgement were all appropriate. Dr. Sparks diagnosed myalgia, right bicep, with essentially normal exam.

On November 7, 2003, plaintiff saw Volare Yantis, M.D., for a sore throat (Tr. at 273).  She was diagnosed with acute bronchitis.

On November 24, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 270).  Plaintiff reported her hypertension and reflux stable on her medication with no adverse effects.  "With regards to dysmetabolic syndrome, feels is relatively

---

[8]Helps the body respond better to insulin and it reduces the amount of sugar produced by the liver.

Case 6:05-cv-03116-REL   Document 14   Filed 03/20/06   Page 27 of 56

stable. Had increased her Actos to 30 mg daily, which she tolerates well with no adverse effects. However, is somewhat discouraged as she is trying to watch her diet as well as exercising somewhat, but appreciated no weight loss. She does have increasing discomfort in her back and knees related to osteoarthritis, but feels this is relatively stable." Dr. Sparks assessed reflux, hyperlipidemia, and hypertension, all stable. "Had a lengthy discussion about diet and exercise, both for cardiovascular fitness, weight loss, stress reduction."

On December 23, 2003, plaintiff saw Dr. Sparks for a follow up (Tr. at 267-268). Plaintiff complained of back pain, she reported her reflux was stable and her hypertension was stable. Plaintiff complained of fatigue related to an inability to sleep well. With regard to her dysmetabolic syndrome, plaintiff felt she had been tolerating her Actos well with no adverse effects. Dr. Sparks examined plaintiff's back and found vague tenderness to palpation but no distal radiculopathy. Plaintiff's mood, affect, and judgement were all appropriate. Dr. Sparks assessed the following:

1.      Back pain, lumbar, degenerative joint disease, multilevel, nonsurgical.

2.      Hypertension, which is stable.

3.      Hyperlipidemia.

4.      Reflux.

5.      Fatigue/malaise.

6.      Insomnia.

7.      Dysmetabolic syndrome.

8.      Question of sleep apnea.

He planned to send her for a sleep study, told her to stop taking Neurontin and start taking Topamax. "We discussed potentially stopping her Lexapro and may add Wellbutrin in an attempt for appetite suppression, as well as improve her sleep patterns in attempt to get her weight loss, which may improve her back."

On January 12, 2004, plaintiff saw Dr. Sparks for evaluation of cough (Tr. at 264). Plaintiff reported that her diabetes and hypertension were both stable. Dr. Sparks assessed asthma following suspected viral bronchitis, dysmetabolic syndrome, and hypertension. He continued her current medications and prescribed a nebulizer.

On January 30, 2004, plaintiff saw Dr. Sparks for a follow up (Tr. at 261).

1.      She feels in the ensuing time period [since last exam] has done relatively well. No cough, wheezing. Has not been using her nebulizer except occasionally at night time, but feels that realistically she could 'get by without it.' She feels that still has some medication left, but has no plans to continue on such.

2.      With regards to her hypertension, tolerating medications well with no adverse effects. . . .

3.      With regards to her dysmetabolic syndrome, still on her Actos 30 mg daily, again tolerates this well without any adverse effects. Has not lost any significant weight, but feels somewhat limited by her activity/diet plan.

29

4.      With regards to her back pain, chronic, feels again this has been relatively stable with known history of degenerative disc disease by MRI as well as pain clinic evaluation.  She has been taking her Ultram and has been doing relatively well."

Dr. Sparks performed an exam of plaintiff's back which was somewhat stiff. He found some reproducible tenderness in the midline, lower lumbar, aggravated with forward flexion, hyperextension, and lateral flexion, with straight leg raises and distal motor and neurovascular structures otherwise . . . intact."

He assessed reactive airway disease, improved; hypertension, stable; dysmetabolic syndrome, stable; and back pain, stable.  He continued plaintiff on her medications.  "We had a lengthy discussion about diet and exercise, both for cardiovascular fitness, weight loss, stress reduction."

On February 27, 2004, plaintiff saw Dr. Sparks for evaluation of breathing problems (Tr. at 258-260).  "Apparently had been cleaning her house, noticed a lot of dust, started sneezing with nasal congestion".  Plaintiff noted her hypertension was relatively stable with no adverse effects from her medication. Dr. Sparks assessed:

1.      Bronchitis, questionable allergic rhinitis related to her dusting.

2.      Reactive airway disease.

3.      Hypertension, stable.

4.      Weight gain.

30

He started her on Leva Pak daily for five days, a Combivent inhaler, and Prednisone, and recommended she return in a week.

On April 14, 2004, plaintiff had an MRI of the lumbar spine (Tr. at 309). The impression was "changes of aging at L4-5 intervertebral disc space with bulging annulus."

On May 10, 2004, Dr. Sparks completed a Medical Source Statement - Physical (Tr. at 305-307). He found that plaintiff could frequently lift or carry less than five pounds, occasionally lift or carry less than five pounds, stand or walk for one hour per day and for 30 minutes at a time, sit for three hours per day and for 30 minutes at a time, and had a limited ability to push or pull (although his description is illegible other than the word "lumbar"). He found that plaintiff could never climb or crawl; could occasionally stoop, kneel, crouch, reach, handle, and finger; and that she could frequently balance, feel, see, speak, and hear. She should avoid any exposure to extreme cold, weather, wetness, humidity, hazards, and heights. She should avoid moderate exposure to extreme heat, dust, fumes, and vibration. He stated that plaintiff needs to lie down two to three times per day for one hour at a time due to pain. He was asked if plaintiff experienced medical side effects which decrease her concentration, persistence, or pace, and he checked "yes", writing "narcotic/seizure meds decrease concentration."

31

### C.   SUMMARY OF TESTIMONY

During the June 8, 2004, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

### 1.   Plaintiff's testimony.

At the time of the hearing, plaintiff was 56 years of age and is currently 58 (Tr. at 350).  Plaintiff has a high school education but had special education classes (Tr. at 350).  Plaintiff has some trouble with reading and spelling, but she sometimes reads the newspaper (Tr. at 350).  Plaintiff is 5' 5" tall and weighs a little over 200 pounds (Tr. at 351).

Plaintiff has a driver's license, but it took her three times to pass the written part (Tr. at 352).

Plaintiff last worked in 1995 (Tr. at 352). She stopped working because of back and knee pain (Tr. at 352).  Plaintiff cannot sit for very long because of back pain; and when she shops for groceries, she has to lean on the cart (Tr. at 353).  Plaintiff's pain lasts all day (Tr. at 353).  Sometimes she sits in her recliner for relief (Tr. at 353).  She sits for about 20 minutes at a time, four to five times a day (Tr. at 353).

Plaintiff cannot lift a gallon of milk or a sack of potatoes because it hurts her back (Tr. at 353).  She has trouble bending, crouching, and stooping (Tr. at 353).  Plaintiff testified that she cannot walk a half a block, but she could walk

Case 6:05-cv-03116-REL   Document 14   Filed 03/20/06   Page 32 of 56

across the street (Tr. at 354). She can sit for about 20 minutes at a time (Tr. at 354). Weather changes make her back pain worse (Tr. at 354). Her pain radiates down her legs sometimes, but not all the time (Tr. at 354). The radiating pain makes it more difficult for plaintiff to walk (Tr. at 354).

Plaintiff's knee gave out and she fell, and the cut on her head required six stitches (Tr. at 355). She is supposed to use a cane (Tr. at 355). Plaintiff experiences pain in her knees if she walks (Tr. at 356). Plaintiff cannot sit for very long so she has trouble driving (Tr. at 356).

Plaintiff experiences crying spells and she has trouble sleeping (Tr. at 356). She has to put appointments on her calendar or she will forget them (Tr. at 357). She gets confused easily (Tr. at 357). Plaintiff started on depression medication about three to five months before the hearing (Tr. at 359). She had never taken depression medication before that (Tr. at 359).

It takes plaintiff all day to vacuum her house and dust (Tr. at 357). She can do the laundry if she rests periodically, and she takes breaks while she is cooking (Tr. at 357-358). Plaintiff cannot stand up to get out of the tub, she has to get on her knees to get out and that hurts her knees (Tr. at 358). Plaintiff can take care of her personal hygiene without assistance (Tr. at 358).

Plaintiff does not have any side effects from her medication (Tr. at 352).

2.    Vocational expert testimony.

Vocational expert Michael Lala testified at the request of the Administrative Law Judge.  The vocational expert testified that plaintiff's past relevant work consists of a sewing machine operator, which is a light unskilled job, D.O.T. number 786.685-033, and a hand packager which is a medium, unskilled position, but was performed by plaintiff at the heavy level (Tr. at 361-362).

The first hypothetical involved a person who could do no more than light work with the need to perform postural movements no more than occasionally (Tr. at 362).  The vocational expert testified that such a person could return to plaintiff's past relevant work as a sewing machine operator (Tr. at 362).

The next hypothetical assumed the need for a low-stress work environment with simple, repetitive instructions and no customer service due to depression (Tr. at 362).  The vocational expert testified that the person could still return to plaintiff's past relevant work as a sewing machine operator (Tr. at 362).

The ALJ then asked the vocational expert to assume additionally the need to alternate sitting and standing at intervals of 30 minutes to one hour (Tr. at 362-363).  The vocational expert stated that if the person were to stand for just a brief period of time and then sit right back down, she could perform the sewing machine operator job; however, if the person had to remain standing for very long, she could not perform that job (Tr. at 363).

34

Plaintiff's attorney presented to the vocational expert a copy of the medical source statement physical completed by Dr. Sparks (Tr. at 364). The vocational expert testified that a person with those limitations would be able to perform no work (Tr. at 364).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter issued her opinion on November 22, 2004.

Step one. The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date and that she was insured for disability benefits through September 30, 2002 (Tr. at 13). Plaintiff was required to establish that she was disabled on or before that date (Tr. at 13).

Step two. The ALJ found that plaintiff suffers from degenerative disc disease of the lumbar spine, degenerative joint disease of both knees, and obesity, all severe impairments (Tr. at 14). She found that plaintiff's osteoporosis, gastro-esophageal reflux disease, history of plantar fasciitis, hypertension, and depression are not severe impairments (Tr. at 16).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 16).

Step four. Plaintiff retains the residual function capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand or walk for six hours per

35

eight-hour day; sit for two hours per eight-hour day; must be able to alternate

between sitting and standing every 30 minutes to one hour; and must have a low

stress work environment with simple repetitive instructions and without

performing customer service (Tr. at 16-17). With this residual functional capacity,

plaintiff could return to her past relevant work as a sewing machine operator (Tr.

at 21).

Therefore, plaintiff was found not disabled at the fourth step of the

sequential analysis.

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was

not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the

Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th

Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are

inconsistencies in the record as a whole, the ALJ may discount subjective

complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala,

2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility

determinations and set forth the inconsistencies which led to his or her

conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.

Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits

testimony and gives legally sufficient reasons for doing so, the court will defer to

the ALJ's judgment unless it is not supported by substantial evidence on the record

as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective

complaints is supported by substantial evidence.  Subjective complaints may not

be evaluated solely on the basis of objective medical evidence or personal

observations by the ALJ.  In determining credibility, consideration must be given

to all relevant factors, including plaintiff's prior work record and observations by

third parties and treating and examining physicians relating to such matters as

plaintiff's daily activities; the duration, frequency, and intensity of the symptoms;

precipitating and aggravating factors; dosage, effectiveness, and side effects of

medication; and functional restrictions.   Polaski v. Heckler, 739 F.2d 1320, 1322

(8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as

those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective

complaints of disability are as follows:

> The record, however, does not fully support the claimant's testimony and
> written allegations.  Furthermore, the medical record fails to show any
> severe dysfunction of bodily organs, gross orthopedic abnormalities, or
> significant and persistent neurological deficits, which can reasonably
> account for the degree of pain and functional limitations she alleges.
> Moreover, the claimant's credibility is compromised by a number of

37

inconsistencies. The claimant testified that she was unable to work due to chronic back pain secondary to degenerative disc disease. However, an x-ray of the lumbar spine performed in January 2002, revealed only minimal degenerative changes at L4-5 without subluxation, compression fracture of bony lesion. A follow up visit in September 2002 indicates that the claimant's back pain is much more improved. Also, Dr. Charles J. Ash's examination of the claimant in March 2003, showed a completely normal range of motion of the lumbar spine and knees. She was also found to be neurologically intact. Additionally, subsequent follow up visits in December 2003 and January 2004 indicate that the claimant continues to have full range of motion of all joints despite degenerative disc disease. In addition, she reported doing well following medication therapy including Ultram.

The claimant also testified that she suffers from bilateral knee pain. However, a follow up visit in January 2003 indicates that the claimant has done reasonably well and she has good range of motion of both knees without swelling or increased heat. X-rays of both knees were also noted to be within normal limits. Also, Dr. Benjamin A. Lambert's examination of the claimant's extremities in September 2003, showed good range of motion in the hips, knees and ankles without signs of any acute joint disease. Furthermore, repeated references in the medical record indicate that the claimant remained non-compliant with medication therapy. Moreover, during the hearing, the Administrative Law Judge had an opportunity to observe the claimant. The claimant was appropriately dressed, her gait and speed were normal, and she was able to ambulate, sit, and rise without signs of distress.

Additionally, the claimant testified that she suffers from obesity. She stated that she is 5'5" tall and weighs 200 plus pounds. The record shows that in December 1999, the claimant's height was measured at 5'5" tall and her weight recorded at 202 pounds. When examined in June 2000, the claimant's weight was recorded at 214 pounds. Also, subsequent visits during the period from May 24, 2001 through September 13, 2001, continued to confirm her height at 5'5" and her weight between 206 and 214 pounds, indicating that the claimant has not attempted to decrease her weight. Also, when seen in March 2003 and January 2004, the claimant's height was measured at 5'5" tall and her weight at 200 and 214 pounds, with a body mass index of 33. She was advised to lose weight, which she has not done. Additionally, the record does not document that the

38

claimant has enrolled in an exercise or diet class or in a healthy eating class to promote weight reduction, education, and understanding of various food regiments in an effort to control her diet. Furthermore, the medical record does not show that her obesity has contributed to other disabling impairments such as diabetes or chronic heart failure. Also, the claimant's failure to lose weight could suggest a lack of motivation to be well in order to return to work.

Also, a State agency medical consultant has opined that her impairments are not disabling. This opinion is consistent with the medical record, which shows frequent outpatient records of subjective complaints, but little objective evidence to substantiate the claimant's allegations.

Moreover, the claimant's activities are consistent with an ability to perform light work. The claimant testified that she is able to perform household chores such as cooking, grocery shopping, laundry, dusting, and vacuuming. She further acknowledged that she is able to attend to her personal care such as dressing and bathing without assistance. Also in her forms completed with her application, the claimant stated that she continues to walk daily as a form of exercise. These comments are inconsistent with an allegation of total disability.

While no doubt the claimant has some pain and discomfort associated with her condition, such symptoms are found to be mild to moderate at most. . . .

Also, a review of the claimant's earnings record documents a sporadic work history, with several years of low earnings, as well as several years of no earnings which raises a question as to whether the claimant's continuing unemployment is actually due to any medical impairments.

Furthermore, it is important to note that the claimant stopped working in 1995 due to complaints of back and bilateral knee pain and yet sought no treatment for several years.

(Tr. at 18-19).

39

## 1. PRIOR WORK RECORD

As the ALJ pointed out, plaintiff has a sporadic work history, with several years of low earnings, as well as several years of no earnings which raises a question as to whether the claimant's continuing unemployment is actually due to any medical impairments. Additionally, plaintiff stated in her Disability Report that she is needed at home to take care of her husband, and she told Dr. Paff that she really quit working in 1995 in part because her husband's physical problems and her need to take care of him.

## 2. DAILY ACTIVITIES

In her 2001 Claimant Questionnaire, plaintiff stated that she does all the household chores herself, she drives to the grocery store, she drives her husband to his doctor appointments, she drives to visit her children, she takes care of her husband who had a stroke, and she takes care of her two pet birds. In another Claimant Questionnaire dated two years later, plaintiff stated that she does the household chores herself.

Plaintiff told Dr. Sparks in August 2003 that she was walking two miles three times a week and was riding her stationary bike 30 minutes before going to bed. In November 2003, plaintiff told Dr. Sparks she was "exercising somewhat." In February 2004, plaintiff went to the doctor after breathing in dust while cleaning her house.

This evidence clearly contradicts plaintiff's testimony wherein she said she cannot sit for very long because of back pain, and she cannot walk so much as a half a block.

### 3.     DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

In December 2000, Dr. Shaeffer noted that plaintiff's back was within normal limits.  In August 2002, plaintiff's hypertension, anemia, hyperlipidemia, and back pain were all unchanged and all stable.  In September 2002, plaintiff reported that her back pain was better.  Her hypertension, hyperlipidemia, amenia, back pain, and allergic rhinitis were all unchanged.  In May 2003, Dr. Sparks examined plaintiff's back and found no significant change from the previous exam, and plaintiff said that her back pain had been relatively stable since her last exam.  In June 2003, plaintiff said her reflux was considerably better and her symptoms had alleviated.  She said her back pain was unchanged and she was tolerating her medication well with no adverse affects.  In August 2003, plaintiff said her reflux had been relatively stable.  In November 2003, plaintiff told Dr. Sparks that the discomfort in her back and knees was relatively stable.  In January 2004, plaintiff told Dr. Sparks her back pain had been relatively stable. She had been taking Ultram and had been doing "relatively well."  There simply are no medical records supporting plaintiff's allegations of disabling pain.

41

## 4.    PRECIPITATING AND AGGRAVATING FACTORS

The only aggravating factor I can find in the record is plaintiff's dusting her home during housecleaning which caused, on one occasion, her to suffer sneezing and nasal congestion.

However, in April 2003, plaintiff told Dr. Sparks that her lumbar back pain was "somewhat better with pressure as well as sitting."  Therefore, I note that instead of sitting being an aggravating factor, the record suggests that sitting actually relieved some of plaintiff's pain symptoms.

## 5.    DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In a 2001 Claimant Questionnaire, plaintiff reported that she has no side effects from her medication.  In May 2003, plaintiff's hypertension was stable on her medication with no adverse side effects.  She was tolerating her hyperlipidemia medications with no adverse effects.  Plaintiff was tolerating her Lopid (for high cholesterol) well.  In June 2003, plaintiff said her back pain was unchanged and she was tolerating Neurontin well with no adverse effects.  In October 2003, plaintiff was tolerating her Actos (for dysmetabolic syndrom) well with no adverse effects.  In November 2003, plaintiff's hypertension and reflux were stable on her medication with no adverse effects.  Plaintiff continued to tolerate her Actos well with no adverse effects.  In January 2004, plaintiff was tolerating Actos well with no adverse effects.  She was doing relatively well on

Ultram, prescribed for back pain.  In February 2004, plaintiff's hypertension was stable with no adverse effects from her medication.  Finally, plaintiff testified at the administrative hearing that she has no side effects from her medication.

In August 2000, plaintiff was given Ibuprofen for her back pain.  In January 2001, Dr. Shaeffer recommended that plaintiff "just use ibuprofen or naproxen" for stiffness in her knee.  In December 2001, plaintiff said Celebrex was helping her generalized pain.  In January 2002, plaintiff said the Celebrex was working well. In September 2003, Dr. Lampert recommended a "mild analgesic" for plaintiff's back pain.  He also recommended that she participate in physical therapy and lose weight to help with her back pain.

The evidence establishes that plaintiff's medications work fairly well to control her symptoms and that she suffers no adverse side effects from these medications.

## 6.    FUNCTIONAL RESTRICTIONS

Plaintiff's doctors have never restricted her activities.  In fact, the record is full of recommendations that she increase her physical activity.

In an undated record from the Kitchen Clinic sometime between November 2000 and May 2001, the doctor recommended that plaintiff walk one to two miles every day.  On multiple visits in April 2002, the Doctor's Hospital of Springfield recommended that plaintiff exercise.  In March 2003, Dr. Ash found

43

that plaintiff can stand and walk six hours a day, lift 20 pounds occasionally, and lift 10 pounds frequently. In April 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise. In June 2003, Dr. Sparks encouraged plaintiff to exercise. In August 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight. In October 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight. In November 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight. In January 2004, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight. Despite all those discussions, Dr. Sparks noted in February 2004 that plaintiff had actually gained weight.

Dr. Paff observed that plaintiff was able to sit on the backless exam table for 40 minutes without difficulty. Dr. Ash observed that plaintiff could move about satisfactorily without limp or list; she walked on toes and heels satisfactorily; and she had no difficulty arising from the chair, dressing, or undressing.

In December 2000, Dr. Shaeffer told plaintiff to stop using crutches within a week or two. Plaintiff testified that she is supposed to use a cane; however, no doctor has ever recommended that plaintiff use a cane.

This factor clearly supports the ALJ's credibility determination.

44

B.    *CREDIBILITY CONCLUSION*

In addition to the above factors, I note that plaintiff stated in her administrative forms and to her doctors that she cannot work because she is needed at home to take care of her husband who has had multiple strokes and has lost both his legs.  Although plaintiff's alleged onset date is January 1995, the first medical visit in the record is dated June 19, 1998.  There is only one record from 1998, two records from 1999, and plaintiff's ongoing medical care did not really start until August 2000 -- five and a half years after her alleged onset date.

Plaintiff told Dr. Paff in 2001 that she vomits after each meal, but he noted that despite this alleged vomiting, she had actually gained weight.

In September 1999, plaintiff told her doctor she was feeling well.  In December 1999, she said she had no health complaints.  In December 2000, her back was examined and it was within normal limits.  In October 2001, Dr. Paff found full range of motion in her lumbar spine and normal laboratory tests.  In July 2002, plaintiff said she was doing pretty good except a feeling that her hands and feet were swollen.  The doctor found only trace edema.  In January 2003, Dr. Shaeffer found good range of motion in both plaintiff's knees, her x-rays were within normal limits and showed only a little thinning of the cartilage between the knee cap and the femur of the right knee.  In March 2003, Dr. Ash found normal range of motion in the thoracic spine, cervical spine, upper extremities, and

Case 6:05-cv-03116-REL   Document 14   Filed 03/20/06   Page 45 of 56

normal extremities.  Her gait was normal without any assistive device.  In September 2003, Dr. Lampert found good range of motion in plaintiff's knees, and there was no sign of any acute joint disease in her upper or lower extremities.  She had only mild degenerative changes in her knees per x-ray, and her MRI showed only mild facet arthrosis.  Plaintiff had "some mild" lumbar spondylosis, and the doctor recommended "mild analgesics".  In October 2003, Dr. Sparks noted an "essentially normal exam."  In December 2003, Dr. Sparks told plaintiff that losing weight may improve her back, yet she continued to gain weight.  In January 2004, plaintiff told Dr. Sparks she had been doing relatively well.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's determination that plaintiff's subjective complaints of disabling pain are not entirely credible.

## VII.   NON-SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in finding plaintiff's foot pain, hypertension, osteoporosis, plantar fasciitis, allergic rhinitis, and depression non-severe.

There is almost no evidence of foot pain, osteoporosis, or plantar fasciitis in this record.  In June 2001, plaintiff complained of pain in her left foot and was given Vioxx.  In September 2001, she complained of pain in her right heel.  In October 2001, Dr. Paff noted tenderness over the plantar arch of plaintiff's right

46

foot. He recommended treatment, without stating what type of treatment, but there is no evidence in the record that plaintiff was ever treated for her foot pain. In February 2002, her heel pain was listed as stable.

The consistent evidence in the record establishes that plaintiff's hypertension is stable and causes her no problems. In November 2000, plaintiff's blood pressure was "OK". In December 2000, plaintiff's hypertension was well controlled. In May 2001, her hypertension was controlled. In January 2002, her hypertension was stable. In February 2002, her hypertension was stable. In April 2002, her hypertension was stable. In June 2002, her hypertension was stable. In July 2002, her hypertension was stable. In August 2002, her hypertension was stable. In September 2002, her hypertension was stable. In April 2003, plaintiff told Dr. Sparks she had had hypertension for several years but it was under control with medication. In May 2003, plaintiff's hypertension was stable. In November 2003, her hypertension was stable. In December 2003, her hypertension was stable. In January 2004, she was tolerating her hypertension medication with no adverse side effects. In February 2004, her hypertension was stable. There is no evidence in the record that plaintiff's hypertension was ever not under control.

Plaintiff's allergic rhinitis was listed as stable in November 2001. In January 2002, her allergic rhinitis was listed as stable. In February 2002, her allergic

rhinitis was listed as stable. In September 2002, her allergic rhinitis was stable. In February 2004, Dr. Sparks noted questionable allergic rhinitis related to plaintiff's dusting.

There is no evidence at all that plaintiff has ever suffered any symptoms of depression. In March 2003, Dr. Burstin found no medically determinable mental impairment. In September 2003, plaintiff told Dr. Lampert that she was depressed, anxious, stressed, and had panic attacks; however, Dr. Lampert noted no evidence of any of these symptoms. In fact, he noted that her mood and affect were appropriate.

Plaintiff never mentioned any symptoms of depression to any treating doctor with the exception of complaining of nervousness and family related stress in May 2001. In fact, on many occasions, plaintiff's mental status was observed to be normal. In June 1998, plaintiff completed paperwork to establish care with Dr. Shaeffer and did not check the box marked "depression". Plaintiff's treating physician at the Doctor's Hospital of Springfield noted that she had normal judgment and insight, and her mood and affect were appropriate in November 2001; December 2001; January 2002; April 2002; June 2002; July 2002; August 2002; and September 2002. Dr. Sparks noted that plaintiff's mood, affect, and judgement were appropriate in April 2003; May 2003; June 2003; August 2003; October 2003; and December 2003. There simply is no evidence that plaintiff

ever experienced symptoms of depression.

I note here that plaintiff testified she began taking medication for depression three to five months before the hearing, which was on June 8, 2004. There is no evidence in the medical records that plaintiff was ever prescribed medication for depression. On December 23, 2003, Dr. Sparks prescribed Wellbutrin for appetite suppression in order to help plaintiff lose weight. Wellbutrin is an antidepressant; however, Dr. Sparks specifically stated in the medical record that Wellbutrin was being prescribed for appetite suppression.

I find that the substantial evidence in the record supports the ALJ's determination that plaintiff's foot pain, hypertension, osteoporosis, plantar fasciitis, allergic rhinitis, and depression are non-severe.

## VIII.    OPINIONS OF DR. SPARKS, DR. PAFF, AND DR. ASH

Plaintiff argues that the ALJ improperly failed to give controlling weight to the opinions of treating physicians Dr. Sparks and Dr. Paff, and improperly gave too much weight to the opinion of Dr. Ash.

Dr. Sparks.  Dr. Sparks treated plaintiff from April 4, 2003, until February 24, 2004.  He completed a Medical Source Statement on May 10, 2004, which is the subject of plaintiff's argument.

In the Medical Source Statement, Dr. Sparks found that plaintiff could frequently lift or carry less than five pounds, occasionally lift or carry less than five

49

pounds, stand or walk for one hour per day and for 30 minutes at a time, sit for

three hours per day and for 30 minutes at a time, and had a limited ability to

push or pull (although his description is illegible other than the word "lumbar").

He found that plaintiff could never climb or crawl; could occasionally stoop,

kneel, crouch, reach, handle, and finger; and that she could frequently balance,

feel, see, speak, and hear.  She should avoid any exposure to extreme cold,

weather, wetness, humidity, hazards, and heights.  She should avoid moderate

exposure to extreme heat, dust, fumes, and vibration.  He stated that plaintiff

needs to lie down two to three times per day for one hour at a time due to pain.

He was asked if plaintiff experienced medical side effects which decrease her

concentration, persistence, or pace, and he checked "yes", writing

"narcotic/seizure meds decrease concentration."

Dr. Sparks's medical records do not support his opinion in the Medical

Source Statement.  There is no evidence in the records that Dr. Sparks ever limited

plaintiff's lifting or that she ever complained of difficulty lifting.  Contrary to his

limitations on her standing and walking, Dr. Sparks constantly encouraged plaintiff

to exercise.  In April 2003, Dr. Sparks had a lengthy discussion with plaintiff about

the need to exercise.  In June 2003, Dr. Sparks encouraged plaintiff to exercise.  In

August 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to

exercise and lose weight.  In October 2003, Dr. Sparks had a lengthy discussion

with plaintiff about the need to exercise and lose weight.  In November 2003, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight.  In January 2004, Dr. Sparks had a lengthy discussion with plaintiff about the need to exercise and lose weight.  These recommendations in the medical records also contradict Dr. Sparks's opinion in the Medical Source Statement that plaintiff needs to lie down two to three times per day for one hour at a time due to pain.  Dr. Sparks constantly encouraged  plaintiff to get up and move, not to lie down.  Dr. Sparks noted that plaintiff's concentration, persistence, and pace were adversely affected by her medication; yet, in all of his records he noted that plaintiff had no adverse side effects from any medication.  In fact, plaintiff testified at the hearing that she suffers no side effects from her medication.

Although the testing and physical exams in Dr. Sparks's medical records support the assessments and recommended treatment in his medical records, there is nothing in the record that supports his opinion in the Medical Source Statement.

Dr Paff.  Plaintiff saw Dr. Paff on one occasion, October 31, 2001, at the request of the Division of Family Services.  Therefore, Dr. Paff was not a treating physician.

Dr. Paff found that plaintiff's most significant problem was her esophagus. He placed this problem above any pain, including her back pain and foot pain. He based this esophagus problem on plaintiff's statement that she throws up

undigested food after each meal, and she feels like the food gets hung up in her esophagus. Dr. Paff then noted that plaintiff had not lost any weight from this constant vomiting but had in fact gained weight. There are no tests that were performed on plaintiff's esophagus.

Dr. Paff stated that he "imagined" that osteoporosis was present. Based on that statement, Dr. Kester performed a bone density test and found that plaintiff's bone density was normal.

Dr. Paff found that plaintiff had full range of motion in her lumber spine, shoulders, neck, and knees. All of her laboratory tests were normal except her cholesterol and triglycerides were slightly elevated. Based on that record, Dr. Paff stated that it was unlikely that plaintiff will return to work and is "probably disabled." There simply is no support, either in Dr. Paff's records or anywhere else in plaintiff's medical records, to support his statement that she is probably disabled.

Dr. Ash. Dr. Ash was a consultative physician who found that plaintiff could stand and walk six hours in a workday and lift 20 pounds occasionally and 10 pounds frequently. Dr. Ash performed an exhaustive exam and found that plaintiff had normal range of motion in her cervical spine, thoracic spine, upper extremities, and lower extremities. There are no tests or records which conflict with Dr. Ash's findings.

52

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's determination to discredit the above-mentioned opinions of Dr. Sparks and Dr. Paff and to rely on the opinion of Dr. Ash.

## IX.    CONSULTATIVE EXAM

Plaintiff argues that the ALJ erred in failing to request a consultative exam and medical source statement regarding plaintiff's depression and possible borderline intellectual functioning.  As discussed at length above, there is simply no evidence in the record that plaintiff suffered from a mental impairment.  All of the evidence in the medical records establishes that plaintiff's mental health was normal throughout her years of medical treatment.

## X.    RESIDUAL FUNCTIONAL CAPACITY COMPARISON

Finally, plaintiff argues that the ALJ erred in failing to compare plaintiff's residual functional capacity with the requirements of plaintiff's past relevant work.

The ALJ found that plaintiff could, among other things, sit for a total of two hours per day and must alternate between sitting and standing every 30 minutes to one hour.  The ALJ then found that plaintiff could return to her past relevant work as a sewing machine operator.

In her hypothetical question to the vocational expert, the ALJ's question was whether a person could perform plaintiff's past work if that person perform "no more than light [work] as generally defined by the regulations" (Tr. at 362).

53

Light work requires walking or standing to a significant degree, sitting most of the time but pushing and pulling of arm or leg controls, or constant pushing or pulling of materials even though the weight of those materials is negligible.

In her October 22, 2001, Disability Report, plaintiff stated that she worked as a sewing machine operator from 1988 through 1992, four days per week, ten hours per day, and she sat all ten hours per day (Tr. at 67). In a Work History Report dated November 15, 2001, plaintiff described her sewing machine operator job as requiring no standing, climbing, kneeling, crouching, or crawling, but she said the job required constant sitting. In her Disability Report dated December 25, 2002, plaintiff stated that while working as a sewing machine operator, she sat constantly and did no standing (Tr. at 95). There is no other evidence of what is required of a sewing machine operator.

The ALJ asked the vocational expert whether a person who needed to alternate sitting and standing every 30 minutes to one hour could be a sewing machine operator. The vocational expert testified that the person could be a sewing machine operator if she were to stand for just a brief period of time and then sit right back down. "If she had to remain standing for more than a very brief period of time, no."

It appears from this record that a sewing machine operator must sit most of the time. The ALJ found that plaintiff can sit for only two hours per day.

54

Although the record seems to support a finding that plaintiff can sit for much longer than that (I note here that even Dr. Sparks in his very exaggerated Medical Source Statement found that plaintiff could sit for three hours), the fact remains that the ALJ found plaintiff can only sit for two hours.

The record does not show that the ALJ compared the sitting requirements of the sewing machine operator job with plaintiff's sitting abilities. The ALJ did not make an alternate finding at step five of the sequential analysis.

Because the record does not support the ALJ's finding that plaintiff can perform her previous work as a sewing machine operator, and because there is no alternate finding at step five of the sequential analysis, this case must be remanded for further consideration. I do not mean to imply that there cannot be a finding that plaintiff can return to her past relevant work as a sewing machine operator. I simply state here that the current administrative record does not support such a finding.

## XI. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's subjective allegations of disabling pain are not credible; that plaintiff's foot pain, hypertension, osteoporosis, plantar fasciitis, allergic rhinitis, and depression are not severe; that the opinions of Dr. Sparks and Dr. Paff should not have controlling weight; and that there was no need for a

55

consultative exam or medical source statement regarding plaintiff's depression and possible borderline intellectual functioning. I further find that the substantial evidence in the record does not support the ALJ's finding that plaintiff can return to her past relevant work as a sewing machine operator. Therefore, it is

ORDERED that the decision of the Commissioner is reversed, and this case is remanded pursuant to Sentence Four. On remand, the Commissioner shall compare the plaintiff's residual functional capacity to the requirements of her past relevant work and, if necessary, make an alternate finding at step five of the sequential analysis.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 17, 2006

56